IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CURTIS LEE SLEDGE,

      Petitioner,                    No. 2: 08-cv-1748 LKK KJN P

    vs.

D. K. SISTO,

      Respondent.             FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding without counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 1981, petitioner was convicted of first degree murder with use of a deadly weapon and robbery.  Petitioner was sentenced to 32 years to life in prison.

        In the instant action, petitioner challenges the 2006 decision by the California Board of Parole Hearings ("BPH") finding him unsuitable for parole.  This was petitioner's third suitability hearing.  This action is proceeding on the original petition filed by petitioner on July 29, 2008.  Petitioner raises the following claims: 1) insufficient evidence to support the finding of unsuitability; and 2) the BPH panel was not impartial.

////

After carefully considering the record, the undersigned recommends that the petition be denied.

II. Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254. Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 405. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law; or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Id. at 407-08. It is this prong of the AEDPA standard of review which directs deference be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 410-11 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19 (2002).

"Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court. Wright v. Van Patten, 552 U.S. 120 (2008). Thus, extrapolations of

settled law to unique situations will not qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority, in arriving at their decision. Early v. Packer, 537 U.S. 3 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

When reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

////

////

////

III. <u>Analysis</u>

      A. <u>Alleged Insufficient Evidence</u>

      In claim one, petitioner alleges that there was insufficient evidence to support the BPH's 2006 decision finding him unsuitable for parole.

      The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits state action that "deprive[s] a person of life, liberty or property without due process of law." U.S. Const. amend. XIV, § 2. A person alleging a due process violation must demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. <u>Kentucky Dep't. of Corrs. v. Thompson</u>, 490 U.S. 454, 459-60 (1989); <u>McQuillion v. Duncan</u>, 306 F.3d 895, 900 (9th Cir. 2002). A protected liberty interest may arise from either the Due Process Clause itself or from state laws. <u>Board of Pardons v. Allen</u>, 482 U.S. 369, 373 (1987). In the context of parole, the United States Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole date, even one that has been set. <u>Jago v. Van Curen</u>, 454 U.S. 14, 17-21 (1981). However, when a state's statutory parole scheme uses mandatory language, it "'creates a presumption that parole release will be granted' when or unless certain designated findings are made, thereby giving rise to a constitutional liberty interest." <u>McQuillion</u>, 306 F.3d at 901 (quoting <u>Greenholtz v. Inmates of Neb. Penal</u>, 442 U.S. 1, 12 (1979)).

      Under California law, prisoners serving indeterminate prison sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement." <u>In re Dannenberg</u>, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417 (2005). Generally, one year prior to an inmate's minimum eligible parole release date, the Board will set a parole release date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." <u>In re Lawrence</u>, 44 Cal.4th 1181, 1202, 82 Cal.Rptr.3d 169 (citing Cal.Penal Code § 3041(a)). A release date will not be set,

however, if the Board determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration. . . ." Cal.Penal Code § 3041(b).

California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date. Allen, 482 U.S. at 377-78 (quoting Greenholtz, 442 U.S. at 12); Irons v. Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006)); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion, 306 F.3d at 903.

In the context of parole proceedings, it is well established that inmates are not guaranteed the "full panoply of rights" afforded to criminal defendants under the Due Process Clause. See Pedro v. Or. Parole Bd., 825 F.2d 1396, 1398-99 (9th Cir. 1987). Nonetheless, inmates are afforded limited procedural protections. The Supreme Court has held that a parole board's procedures are constitutionally adequate so long as the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. Hayward v. Marshall, 603 F.3d 546, 560 (9th Cir. 2010) (quoting Greenholtz, 442 U.S. at 16). As a matter of state constitutional law, denial of parole to California inmates must be supported by "some evidence" demonstrating future dangerousness. Hayward, 603 F.3d at 562 (citing In re Rosencrantz, 29 Cal.4th 616, 128, 128 Cal.Rptr.2d 104 (2002)); see also In re Lawrence, 44 Cal.4th 1181, 1191, 82 Cal.Rptr.3d 169 (2008) (recognizing the denial of parole must be supported by "some evidence" that an inmate "poses a current risk to public safety"); In re Shaputis, 44 Cal.4th 1241, 1254, 82 Cal.Rptr.3d 213 (2008) (same). "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of [the] state," Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010), and compliance with this evidentiary standard is, therefore, mandated by the federal Due Process Clause. Pearson v.

Muntz, 606 F.3d 606, 611 (9th Cir. 2010).  Thus, a federal court undertaking review of a "California judicial decision approving the ... decision rejecting parole" must determine whether the state court's decision "was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

When assessing whether a state parole board's suitability decision was supported by "some evidence," the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." Irons, 505 F.3d at 851.  The court must look to California law to determine what findings are necessary to deem a petitioner unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by "some evidence" or whether it constituted an unreasonable application of the "some evidence" principle.  Id.

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers.  The regulation is designed to guide the Board's assessment regarding whether the inmate poses an "unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. In re Lawrence, 44 Cal.4th at 1202, 82 Cal.Rptr.3d 169.  The Board is directed to consider all relevant, reliable information available, including the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  15 Cal.Code Regs. § 2402(b).

The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole.  15 Cal.Code Regs. § 2402(c)-(d).  Factors tending to show

unsuitability include,

    (1) The Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

        (A) Multiple victims were attacked, injured or killed in the same or separate incidents.

        (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

        (C) The victim was abused, defiled, or mutilated during or after the offense.

        (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

        (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

    (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

    (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

    (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

    (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

    (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(15 Cal. Code Regs. § 2402(c).)

    Factors tending to show suitability include,

    (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

    (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

    (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and

Case 2:08-cv-01748-LKK-KJN   Document 20   Filed 11/05/10   Page 8 of 18

magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

(15 Cal. Code Regs. § 2402(d).)

The overriding concern is public safety, In re Dannenberg, 34 Cal.4th 1061, 1086, 23 Cal.Rptr.3d 417 (2005), and the focus is on the inmate's current dangerousness.  In re Lawrence, 44 Cal.4th at 1205, 82 Cal.Rptr.3d 169.  Thus, under California law, the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a parolee's release would unreasonably endanger public safety.  In re Shaputis, 44 Cal.4th 1241, 1254, 82 Cal.Rptr.3d 213 (2008).  Therefore, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public."  In re Lawrence, 44 Cal.4th at 1212, 82 Cal.Rptr.3d 169.  In other words, there must be some rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  Id. at 1227, 82 Cal.Rptr.3d 169.

////

////

8

In this case, the BPH found petitioner unsuitable for parole in 2006 for the following reasons: 1) there were multiple victims; 2) the offense was carried out in a dispassionate and calculated manner; 3) the victim was abused and defiled during the offense; 4) the offense was carried out in a manner demonstrating an exceptionally callous disregard for human suffering; 5) petitioner's motive was trivial; 6) petitioner's record of extensive criminal involvement and escalating record of criminal violence; 7) petitioner's prison record, which included nine serious disciplinaries and eleven less serious disciplinaries. (Dkt. No. 15-1, at 125-31 of 138.)

In order to put these findings in context, the undersigned will set forth the facts related to the commitment offenses. The facts of petitioner's murder conviction were summarized at the 2006 hearing:

> On September 12th, 1981, in the restrooms in the Sante Fe train depot, Mr. McNally, M-c-N-a-l-l-y, was stabbed in the upper right chest area, causing one and a half inch exterior wound, approximately $300 in cash and $1,300 worth of traveler's cheques were taken from the victim. Sledge was seen exiting the restroom in a rapid manner, and leaving the station by the west doors. Mr. McNally was transported to Center City Hospital, where he expired approximately five hours after the stabbing. The victim was operated on to determine the extent of his injuries. The cause of death was cardiac failure acute, coronary insufficiency due to arterial sclerosis coronary advanced. The coroner testified that the stabbing was a large precipitating factor along with the subsequent surgery, causing the victim's cardiac failure. Sledge was arrested on September 17th, 1980 after his girlfriend who had been pimping, provided a place with information leading to his arrest. She told police that Sledge had told her that he had stabbed the victim in the side to get the money. Witnesses further testified that Sledge subsequently went to the San Diego Hotel, obtained the identification of the victim and cashed the traveler's cheques.

(Dkt. No. 15-1, at 70-71.)

The BPH went on to read petitioner's version of the offense from its own report:

> Sledge stated he robbed the victim in order to supply his drug and alcohol addiction; however, he asked the fact that he was under the influence of alcohol and drugs at the time of the offense be taken into consideration. Also pointed out that he was suffering post-traumatic syndrome as a result of his tour of duty with the United

States Marine Corps in Viet Nam.

(Id., at 72.)

Petitioner's robbery conviction was based on a separate offense which the BPH described herein:

> On August 26th, 1980, at approximately 10:30 p.m., Sledge approached Joe Harris, H-a-r-r-i-s, who was attempting to enter his parked automobile. Sledge came up from behind Mr. Harris, put a knife to his back, and said, "Get your hands up." Mr. Harris could feel the knife pressing against his back. Sledge reached into Mr. Harris' back pocket, pulled out his wallet and then ran away. This occurred in front of the Night Light Inn in National City. Sledge was arrested based upon a composite drawing of the perpetrator in his life crime offense. Sledge was arrested in a taxi cab that was stopped by National City police officers. He had in his possession a knife and a cake cutter. Found under the front seat of the cab, directly in front of where Sledge had been sitting in the cab, was a .32 caliber automatic Colt pistol. The victim of the offenses on Harris' losses, included credit cards and his identification. Mr. Harris stated that the credit cards were subsequently used after the robbery.

(Id., at 73-74.)

The BPH did not describe petitioner's prior record. (Id., at 76-77.) Rather, it noted that petitioner had a "long list of criminal activity." (Id., at 76.) Petitioner's prior criminal record is contained in the probation report. In 1972, petitioner was convicted of carrying a concealed weapon and possession of a loaded firearm. (Dkt. No. 19, at 26.) In 1973, petitioner was convicted of possession of a controlled substance. (Id.) In 1974, petitioner was convicted of being present where controlled substances were used and possession of marijuana. (Id., at 27.) In 1975, petitioner was convicted of possession of marijuana and illegal gambling. (Id., at 28-29.) In 1977, petitioner was convicted of sleeping in a building without permission of the owner, failing to appear and giving false information to an officer. (Id., 30-31.) In 1978, petitioner was convicted of being under the influence of a controlled substance. (Id., at 31.) The probation report also lists numerous arrests for petitioner, but does not state whether these arrests resulted in convictions.

The BPH discussed petitioner's institutional behavior. Commissioner Sullivan noted that at his last suitability hearing in 2002, it had been recommended that petitioner remain disciplinary free, upgrade vocationally and participate in self-help programs. (Dkt. No. 15-1, at 79.) Petitioner had been disciplinary free since his last hearing, but had received nine disciplinaries before that date. (Id.) In September 1999, petitioner was found guilty of being in possession of a controlled substance, i.e. Tylenol III which contains codeine. (Id., at 80). In August 1999, petitioner was found guilty of being in possession of a controlled substance, i.e. morphine. (Id.) In 1984, petitioner was found guilty of a prison disciplinary related to alcohol. (Id.) In 1992, petitioner was found guilty of engaging in conduct likely to lead to violence. (Id.) Petitioner had also received 12 counseling chronos. (Id.)

Petitioner received his GED in 1994. (Id., at 85.) In 1999 petitioner received a certificate from Valley Adult School, which is similar to a high school diploma. (Id.) Petitioner participated in the welding program for four years, but did not obtain a certificate. (Id., at 85-86.) Petitioner completed vocational dry cleaning in 2004. (Id., at 86.)

In 1999, petitioner participated in an anger management group. (Id., at 87.) Petitioner had also been involved with a veterans group. (Id.) Petitioner had been involved in AA for several years including 2002, 2003 and 2005. (Id., at 88.) Petitioner told the BPH that he was still active in AA. (Id.) Petitioner had a chrono from 2002 commending him for his participation in AA and NA. (Id., at 88-89.)

The BPH also discussed the psychological report prepared by Dr. Rouse. (Id., at 95-98.) A copy of this report is attached as an exhibit to the petition. (Dkt. No. 1, at 45-48.) Regarding petitioner's risk of dangerousness the report states, in relevant part,

> Assessment of Dangerousness
>
> At the time of Mr. Sledge's commitment offense, his risk factors for violence were relatively high, given the factors of his unemployment and limited vocational skills, his age, his transient/antisocial lifestyle, his drug dependence, and his criminal history. At the current time, his risk factors appears to have

> diminished substantially. He has made some vocational and educational upgrades. He is much more mature socially and emotionally than he was at the time of his commitment offense. He appears to have developed some insight and understanding of the factors that led to his life crime. He has maintained and sustained a high level of impulse control over the course of the past six or seven years. He has been involved in AA and NA to the extent that his substance abuse is in remission and no longer a problem at this time. As a result of these factors, I would assess Mr. Sledge's risk of dangerousness as average for this inmate population.
>
> Conclusion and Summary:
>
> Mr. Sledge's commitment offense was not caused by a serious mental disorder but more likely aggravated by his Polysubstance dependence. There are no mental health issues that the Board should take into consideration in assessing Mr. Sledge's suitability for parole. However, it is recommended that Mr. Sledge continue in his present program, and should he be paroled to the community, it is strongly recommended that a substance abuse program be a strong component of his parole.

(Id., at 47-48.)

The undersigned now considers whether the pre-commitment factors relied on by the BPH to find petitioner unsuitable, i.e. the circumstances of the offense and petitioner's criminal record, were some evidence of petitioner's current dangerousness. The undersigned first considers whether the BPH properly found evidence of these factors.

Regarding the commitment offense, the BPH first found petitioner unsuitable because multiple victims were involved. Petitioner committed the robbery approximately one year before the murder. Because of the length of time between these unrelated offenses, the BPH's finding of multiple victims was improper.

The BPH next found that the murder was carried out in a dispassionate and calculated manner. Regarding this factor, the BPH stated, "It was carried out in a manner which demonstrates a callous disregard for human suffering, as you described, you didn't care." (Dkt. No. 15-1, at 125.)

////

1    As stated above, the regulations provide that the offense was committed in an
2 especially "heinous, atrocious or cruel" manner if it was carried out in a dispassionate and
3 calculated manner, such as an execution-style murder. 15 Cal. Code Regs, § 2402(c)(1)(B). In
4 order to find that an offense was committed "in an especially heinous, atrocious or cruel manner"
5 there must be some evidence that the "violence and viciousness of the inmate's crime" is greater
6 than that which is "minimally necessary to convict [the defendant] of the offense for which he is
7 confined." 15 Cal.Code Regs. § 2402(c)(1); In re Dannenberg, 34 Cal.4th 1061, 1095, 23
8 Cal.Rptr.3d 417 (2005).

9    In the instant case, petitioner was convicted of first degree murder. First degree
10 murder is defined as "murder which is perpetrated by any kind of willful, deliberate and
11 premeditated killing with express malice aforethought. [¶] The word 'willful,' as used in this
12 instruction, means intentional. [¶] The word 'deliberate' means formed or arrived at or
13 determined upon as a result of careful thought and weighing of considerations for and against the
14 proposed course of action. The word 'premeditated' means considered beforehand." CALJIC
15 8.20. Malice by itself involves "'an element of viciousness – an extreme indifference to the
16 value of human life.'" People v. Summers, 147 Cal.App.3d 180, 184, 195 Cal.Rptr. 21 (1983)
17 (internal citation omitted). Petitioner may also have been convicted based on a theory of felony
18 murder. First degree felony murder is a killing during a course of a felony, such as robbery.
19 People v. Chun, 45 Cal.4th 1172, 1182 (2009).

20    Petitioner stabbed the victim once in the chest area in an attempt to rob him.
21 Based on these facts, it is unclear on what grounds that BPH found that the "violence and
22 viciousness of the inmate's crime" was greater than that which was "minimally necessary to
23 convict [the defendant] of the offense for which he is confined." In re Dannenberg, 34 Cal.4th
24 1061, 1095, 23 Cal.Rptr.3d 417 (2005).

25    The BPH next found that the victim was defiled during the offense. As discussed
26 above, petitioner stabbed the victim once. Under these circumstances, the undersigned does not

find any evidence supporting the BPH's conclusion that the victim was "abused, defiled, or mutilated" during or after the offense. See Maurer v. Calderon, 1997 WL 446229, at *2 (N.D. Cal. 1997) (finding that the record contained some evidence supporting the BPH's finding that the victim had been "abused, defiled or mutilated" during the offense, where the victim was stabbed in the abdomen and the victim's face was slashed with a hunting knife during an attempted robbery but before the victim was fatally shot); Escalante v. Curry, 2009 WL 2524237, at *6 (N.D. Cal. 2009) (finding that record contained some evidence supporting the BPH's finding that the victim had been "abused, defiled or mutilated" during offense when the victim was stabbed in the eye while defenseless on the ground.)

Next, the BPH found that the offense was carried out in a manner demonstrating an exceptionally callous disregard for human suffering. "[T]o demonstrate 'an exceptionally callous disregard for human suffering' (§ 2402, subd. (c)(1)(D)), the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of [first] degree murder." In re Scott, 119 Cal.App.4th 871, 891, 15 Cal.Rptr.3d 32 (2004.)

> In re Van Houten (2004) 116 Cal.App.4th 339, 10 Cal.Rptr.3d 406 illustrates the sort of gratuitous cruelty required. The prisoner in that case was involved in multiple stabbings of a woman with a knife and bayonet. While she was dying, the victim was made aware her husband was suffering a similarly gruesome fate. As stated by the court, "[t]hese acts of cruelty far exceeded the minimum necessary to stab a victim to death." (Id. at p. 351, 10 Cal.Rptr.3d 406.) Other examples of aggravated conduct reflecting an "exceptionally callous disregard for human suffering," are set forth in Board regulations relating to the matrix used to set base terms for life prisoners (§ 2282, subd. (b)) [footnote omitted]; namely, "torture," as where the "[v]ictim was subjected to the prolonged infliction of physical pain through the use of non-deadly force prior to act resulting in death," and "severe trauma," as where "[d]eath resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim."

Id., at 891-92, 15 Cal.Rptr.3d 32.

1       The record in the instant case does not contain facts demonstrating a callous
2  disregard for human suffering.
3       Next, the BPH found the motive for the murder to be trivial. "To fit the
4  regulatory description, the motive must be materially less significant (or more 'trivial') than
5  those which conventionally drive people to commit the offense in question, and therefore more
6  indicative of a risk of danger to society if the prisoner is released than is ordinarily present." Id.,
7  at 893, 15 Cal.Rptr.3d 32. The victim was intentionally stabbed during the course of a robbery.
8  The motivation to obtain money is in itself a trivial motive for murder. In re Honesto,130
9  Cal.App.4th 81, 95, 29 Cal.Rptr.3d 653 (2005). Accordingly, the BPH properly found that
10 petitioner's motive was trivial.
11      The BPH found petitioner unsuitable based on his extensive criminal involvement
12 and escalating record of criminal violence. This finding, based on petitioner's criminal history
13 summarized above, was supported by sufficient evidence.
14      The undersigned now considers whether there was some evidence that petitioner's
15 motive for the crime and his criminal history were indicative of his current dangerousness.
16 While petitioner had been incarcerated for twenty-five years at the time of the 2006 suitability
17 hearing, his prison disciplinary record and the relatively short duration of his AA and NA
18 attendance demonstrated that the circumstances of his commitment offense and prior criminal
19 history were still relevant in determining his current dangerousness.
20      Petitioner's criminal history, as observed by Dr. Rouse, was motivated by
21 polysubstance abuse. Petitioner had nine prison disciplinaries, his last two occurring in 1999 for
22 possession of a controlled substance. At the time of the 2006 disciplinary hearing, petitioner had
23 been attending AA and NA for approximately four years. Considering petitioner's lengthy
24 criminal history, largely motivated by drug addiction, it was not unreasonable for the BPH to
25 conclude that petitioner still posed a risk of danger to the community if released. In 2006,
26 petitioner had not been involved in drug treatment for very long compared to the number of years

he had engaged in drug addiction motivated criminal conduct. Dr. Rouse's assessment of petitioner's risk of dangerousness as average, as opposed to low, also supported the BPH's conclusion.

The record demonstrates that petitioner had engaged in positive programming for several years at the time of the 2006 suitability hearing. However, petitioner's positive programming did not outweigh the factors on which the BPH properly relied to find him unsuitable. For the reasons discussed above, the undersigned finds that some evidence supported the BPH's 2006 finding that petitioner posed a risk of danger if released on parole. After conducting an AEDPA review, the undersigned recommends that this claim be denied.

B. Impartial Panel

Petitioner argues that the panel who oversaw his 2006 suitability hearing was not impartial. While petitioner has a due process right to parole consideration by a neutral, impartial decision-maker, his claim of bias must be supported by the record. See O'Bremski v. Maas, 915 F.2d 418, 422 (9th Cir. 1990) (an inmate is "entitled to have his release date considered by a Board that [is] free from bias or prejudice"); Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995) ("[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

First, petitioner contends that the BPH wrongly stated that there were no letters in opposition to his release on parole. Petitioner argues that the District Attorney had submitted autopsy photos from the victim and a letter. Attached as exhibit A to the petition is a copy of a letter dated June 9, 2006 from Deputy District Attorney Sachs to the BPH. (Dkt. No. 1, at 40-41.) This letter states that a deputy district attorney would appear at petitioner's 2006 suitability hearing. (Id.) The letter also discusses why petitioner should not be granted parole and states that the district attorney's office is resubmitting photographs for the BPH. (Id.)

The undersigned finds no mention of the letter from Deputy District Attorney Sachs or the autopsy photographs in the transcript from the 2006 suitability hearing. In any

event, the BPH's failure to mention this letter or the photographs, of which it may not have been aware, does not demonstrate improper bias.

Petitioner also argues that the BPH was not impartial because it did not fully accept the views and recommendations of Dr. Rouse's psychological report. Petitioner argues that the BPH wrongly found that the report lacked depth when it addressed all relevant topics. After reviewing the record, the undersigned finds that the BPH's observations regarding the psychological report are not evidence of improper bias.

Finally, petitioner contends that the BPH's discussion of his commitment offense, criminal history and prison disciplinary history demonstrates that the BPH acted in a prosecutorial role in denying him parole. The undersigned has reviewed the transcript from the 2006 suitability hearing and finds petitioner's characterization of the BPH as acting prosecutorial to be inaccurate. The BPH's discussion of petitioner's commitment offense, criminal history and prison disciplinary history does not demonstrate improper bias.

After conducting an AEDPA review, the undersigned recommends that this claim be denied.

IV. Conclusion

The undersigned recommends that petitioner's application for a writ of habeas corpus be denied. If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3).

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:   November 4, 2010

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

sl1748.157